IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ASPEN SPECIALITY INSURANCE COMPANY, | )<br>)<br>) |
| Plaintiff/Counter-Defendant, | )<br>) |
| v. | ) Case No. 3:23-cv-01201<br>) Judge Aleta A. Trauger<br>) |
| THE QUARTERS CONDOMINIUM OWNERS ASSOCIATION, INC., | )<br>)<br>) |
| Defendant/Counter-Plaintiff. | ) |

# MEMORANDUM

Before the court is the Rule 12(c) Motion for Judgment on the Pleadings filed by defendant/counter-plaintiff The Quarters Condominium Owners Association, Inc. (the "Quarters") (Doc. No. 23), seeking a judicial declaration that plaintiff/counter-defendant Aspen Specialty Insurance Company ("Aspen") is liable for the full cost to repair, replace, and restore the Quarters' condominium building, which sustained significant damage during the "Christmas Day Bombing" in downtown Nashville on December 25, 2020. Aspen, which issued the insurance policy at issue in this case, opposes the motion. (Doc. No. 25.)

For the reasons set forth herein, the motion, construed as a motion for partial judgment on the pleadings, will be granted, insofar as the court will issue a declaration that the insurance policy exclusion at issue in this case does not apply to the Quarters' claim for coverage of condominium building repairs.

I.  **STANDARD OF REVIEW**

Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The courts assess such

motions "using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)." *Moderwell v. Cuyahoga Cty.*, 997 F.3d 653, 659 (6th Cir. 2021) (citation omitted). For purposes of a motion for judgment on the pleadings, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (citations omitted). In construing the factual allegations in the complaint, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.*

In considering the motion, the court may consider not only the complaint and exhibits attached to it, but also exhibits attached to the moving party's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## II. FACTS AND PROCEDURAL HISTORY

The relevant facts at issue here are undisputed. Aspen is an insurance company based in New York. Quarters is a non-profit corporation organized under Tennessee law and whose principal place of business is in Nashville, Tennessee. (Doc. No. 1, Complaint ¶¶ 1–2.) This lawsuit involves an insurance coverage dispute pertaining to a Tennessee Condominium Policy issued by Aspen, bearing policy number CIUCAP006354-00 (the "Policy"), effective 2/10/19 through 2/10/21, for property located at 178 2nd Avenue North, Nashville, Tennessee 37201 (the "Property"). Quarters is the named insured. A copy of the Policy was filed as an exhibit to the Complaint. (Doc. No. 1-1.)

As indicated above, the Property sustained significant damage during the Christmas Day Bombing that rocked downtown Nashville on December 25, 2020. The Quarters reported the

damage and made a claim for full replacement cost coverage under the Policy to Aspen on December 31, 2020 (the "Claim"). (Complaint ¶ 9; *see also* Doc. No. 21, Counterclaim ¶ 6.) Aspen eventually concluded that the damage merited payment in the amount of the $4,300,000 limit of insurance on the Property and disbursed funds to the Quarters in that amount. (*Id.* ¶¶ 10, 11.)

At issue here is whether additional payment is due under the Policy. The Quarters maintains that further payment is owed under the Guaranteed Replacement Cost Endorsement ("GRC endorsement") in the Policy. Aspen's position is that an exclusion ("Exclusion") under the GRC endorsement applies to the Property and precludes application of the GRC endorsement.

The GRC endorsement states, in relevant part:

**GUARANTEED REPLACEMENT COST ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM.**

In consideration of the premium charged, it is agreed that:

A. Guaranteed Replacement Cost coverage applies only to the building(s) located at the insured Premises set forth in the Declarations for which "GRC" is displayed next to the Limit of Insurance. Guaranteed Replacement Cost coverage is subject to the terms and conditions set forth in this endorsement.

B. If this endorsement is attached to your policy, then we will pay the amount you actually spend which is necessary to repair or replace the damaged building on the same premises without regard to the Limit of Insurance shown in the Declaration, but only if [the identified conditions are satisfied].

. . . .

C. Guaranteed Replacement Cost Coverage shall not apply to:

. . . .

    5. *Building(s) that have been designated by any local, state or national governmental agency as an historic structure or landmark.*

(*Id.* ¶ 12; *see also* Policy, Doc. No. 1-1, at 92–93 (emphasis added).) Aspen's position is that the Exclusion contained in ¶ C(5) applies here. The Quarters' position is that the Exclusion does not apply.

It is undisputed that the Property is, and was at all times relevant to this lawsuit, a "contributing property" within the Second Avenue Commercial History District (the "District") and that the District is designated as a historic "district" on the National Register of Historic Places ("NRHP"). (Complaint ¶ 7; Doc. No. 21, Answer ¶ 7.) The Property is also within the Second Avenue Historic Preservation Zoning Overlay. (Complaint ¶ 8; Answer ¶ 8.)

Aspen filed suit in this court on November 14, 2023, seeking a declaration that "the Policy does not provide coverage to Defendant in excess of previously paid policy limits of $4,300,000 for the Claim" (Complaint ¶ 19), and, more particularly, judicial findings that "[t]he GRC endorsement does not apply to the Property because of its designation as a historical building or structure by local, state or national government or administrative agencies" (*id.* ¶ 22); "[t]he Property's designation on the National Register of Historic Places renders the property a historical building or structure" (*id.* ¶ 23); and "[b]ecause the Property is listed on the National Register of Historic Places, and located within Second Avenue Commercial History District, and The Tennessee Historical Commission is nominating authority for the District, the Property is designated as, and considered, a historical building or structure exempt from the GRC coverage in the Policy" (*id.* ¶ 24).

The Quarters filed an Answer to Aspen's Complaint, asserting that, although the Property is identified as a "contributing building" within a designated historic district, the Property itself has never been "designated" by any local, state or national agency as a "historic structure or landmark." (Answer ¶ 23.) It also filed a Counterclaim along with its Answer, seeking a declaration

that "the Policy's GRC Endorsement covers the Claim and Aspen owes the Quarters the full replacement cost coverage due under the Policy."[1] (*See* Doc. No. 21, Counterclaim ¶ 28; *see also id.* ¶ 15 ("In the context of the National Register of Historic Places, buildings may be explicitly classified as either a historic "structure" or "landmark." The Quarters has not been so designated."); Doc. No. 21-7, at 2 (Nomination Form identifying the name of the entity seeking to be designated on the NRHP as the "Second Avenue Commercial District" and identifying the "classification" sought as "District" (rather than "Site," "Building," "Structure," or "Object")).)

Shortly after filing its Answer and Counterclaim, the Quarters filed the present Motion for Judgment on the Pleadings and a supporting Memorandum of Law (Doc. Nos. 23, 24), seeking partial judgment in its favor in the form of judicial declaration that the Property has not been individually designated as a historic building or landmark and, therefore, is not subject to the Exclusion set forth in the GRC endorsement. Aspen opposes the motion (Doc. No. 25), arguing generally that it has "more than sufficiently plead[ed] its allegations representing the material elements of its claim" for a declaratory judgment in *its* favor. (Doc. No. 25, at 1.) The Quarters filed a Reply, urging that the question presented is purely a legal one involving the interpretation of a contract, not one involving the resolution of any facts. (Doc. No. 26.)

### III. DISCUSSION

#### A. The Interpretation of Insurance Contracts Generally

The parties agree that Tennessee law applies to this dispute. "Tennessee law is clear that questions regarding the extent of insurance coverage present issues of law involving the

---

[1] The Quarters also asserts counterclaims for breach of contract and for a declaration pertaining to another Policy term, none of which are at issue in its Motion for Judgment on the Pleadings; nor does it seek damages. Its motion, therefore, would more appropriately be characterized as a motion for *partial* judgment on the pleadings, and the court construes it as such.

interpretation of contractual language." *Garrison v. Bickford*, 377 S.W.3d 659, 663 (Tenn. 2012). And the interpretation of insurance contracts is "governed by the same rules of construction used to interpret other contracts." *Travelers Indem. Co. of Am. v. Moore & Assocs.*, 216 S.W.3d 302, 305–06 (Tenn. 2007) (citing *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990)). Generally, this means that "the terms of an insurance policy should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties. The policy should be construed as a whole in a reasonable and logical manner, and the language in dispute should be examined in the context of the entire agreement." *Garrison*, 377 S.W.3d at 664 (internal quotation marks and citations omitted). "The 'ordinary meaning' envisioned is the meaning which the average policy holder and insurer would attach to the policy language." *S. Tr. Ins. Co. v. Phillips*, 474 S.W.3d 660, 667 (Tenn. Ct. App. 2015). That is, the language of an insurance contract "must be read as a layman" would read it. *Id.*

In construing an insurance contract, the court's initial task is "to determine whether the language is ambiguous." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). If it is not, then the "literal meaning controls the outcome of the dispute." *Id.* However, if the contract language is susceptible of more than one reasonable interpretation, then "the parties' intent cannot be determined by a literal interpretation of the language." *Id.*; *see also Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975) (contract language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one").

If the contract language is ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Id.* Generally, "[w]hen an ambiguity is found in an insurance policy, it 'must be construed strongly against the insurer and in favor of the insured.'" *Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*, 572 S.W.3d 636, 644 (Tenn. Ct. App. 2018)

(quoting *Fisher v. Revell*, 343 S.W.3d 776, 780 (Tenn. Ct. App. 2009)). In addition, under Tennessee law, "exclusions and limitations in insurance policies must be construed against the insurance company and in favor of the insured," *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991), though the court "will not give them such a forced, unnatural or unreasonable construction as would lead to nonsense or absurdity," *Johnson & Assocs.*, 572 S.W.3d at 644 (citations omitted). "A contract term is not ambiguous merely because the parties to the contract may interpret the term in different ways." *Adkins*, 360 S.W.3d at 412 (citation omitted). However, "if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Garrison*, 377 S.W.3d at 664.

### B. Whether the Policy Is Ambiguous

The sole issue presented for resolution by the Quarters' motion is the proper interpretation of the policy Exclusion within the GRC endorsement for "[b]uilding(s) that have been designated by any local, state or national governmental agency as an historic structure or landmark." (Policy, Doc. No. 1-1, at 92–93.) As set forth above, the court's first task in construing this provision is to determine whether it is ambiguous.

The court finds that the provision is not ambiguous. By its plain language, for the Exclusion to apply, the Property must have been "designated" by a government agency as a "historic structure or landmark." Construing this phrase, the court finds first that the plain meaning of the term "designate" is "to indicate and set apart for a specific purpose, office, or duty." *See* https://www.merriam-webster.com/dictionary/designate; *see also City of Collegedale v. Hamilton Cty. Water & Wastewater Treatment Auth.*, No. E2001-02041-COA-R3CV, 2002 WL 1765776, at *4 (Tenn. Ct. App. July 31, 2002) (defining "designate" as "1(a) 'to point out the location'; (b) to indicate; (c) to distinguish as to class; (d) specify, stipulate; 2. to call by a distinctive title, term or expression; 3. 'to indicate and set apart for a specific purpose, office or duty;' 4. Denote."

(quoting Webster's New Collegiate Dictionary (1974)). In *City of Collegedale*, the court was not persuaded by the defendant's argument that "the installation of its equipment served to designate its service area," where it was otherwise undisputed that "no specific designation of a service area had been made as of the effective date of the City's annexation," and "it was incumbent upon the Authority to take some formal action . . . to designate its service area." *City of Collegedale*, 2002 WL 1765776, at *4. Other courts, too, have found that the term implies some formal action on the part of the designating authority. *See, e.g.*, *Ho-Chunk Nation v. Wis. Dep't of Rev.*, 766 N.W.2d 738, 747 (Wis. 2009) (holding that "the phrase 'was designated a reservation or trust land' [in a state statute] is necessarily read as referring to the applicable formal process that must occur in order for land to be a reservation or trust land").

The only two possible designating agencies at issue here are the National Parks Service, which administers the NRHP listings,[2] and the Metropolitan Nashville Historic Zoning Commission,[3] which administers preservation overlays within Metropolitan Nashville and Davidson County ("Metro Nashville"), including the Second Avenue Historic Preservation Zoning Overlay. (Complaint ¶¶ 7, 8, 23, 24.)

As for designation by the National Parks Service, as set forth above, it is undisputed that the Property was *identified* on the National Register of Historic Places Inventory – Nomination Form as a "contributing" property within the District, but it has not been individually "designated" as a historic structure by the National Park Service. As the Quarters argues persuasively, there is a difference between being a "contributing building" within a historic district and actually being "designated" as a historic structure. The regulations define separately the types of properties that

---

[2] *See* https://www.nps.gov/subjects/nationalregister/index.htm.

[3] *See* https://www.nashville.gov/departments/historic-preservation/programs/districts-and-design-guidelines.

can be listed on the NRHP. "District" is defined as "a geographically definable area . . . possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united by past events or aesthetically by plan or physical development." 36 C.F.R. § 60.3(d). A structure, by definition, includes a building, but it also encompasses "engineering project[s]" that may be "large in scale," such as a bridge, tower, or lighthouse. *Id.* § 60.3(p).

Regardless, the fact that a building is considered a "contributing" structure within a historic district would not automatically confer on it independent "historic" status. Thus, for example, a "Certified Historic Structure" for purposes of the Internal Revenue Code may be either a building individually listed in the NRHP, or it may be located within a "registered historic district *and certified by the Secretary as being of historic significance to the district*." 36 C.F.R. § 67.2. If the property is individually listed, "it is generally considered a certified historic structure" without the need for further certification. *Id.* § 67.4(d). But properties within a district—even "contributing" properties—must be individually reviewed for a determination as to whether they have "historic significance to the district" in order to qualify for such certification. *Id.* § 67.5(a). This is because districts listed on the NRHP are often

> resources whose concentration or continuity possesses greater historical significance than many of their individual component buildings and structures. These usually are documented as a group rather than individually. Accordingly, this type of National Register documentation is not conclusive for the purposes of this part and must be supplemented with information on the significance of the specific property.

*Id.* § 67.5(c).[4] Aspen does not allege that the Property has been individually certified. Moreover, it is also clear that a building or structure within a historic district may be individually designated

---

[4] Aspen baldly alleges that the "Property's designation on the [NRHP] also entitles the Property to certain benefits including, but not limited to, financial incentives as a Certified Historic Structure under the Internal Revenue Code." (Doc. No. 1 ¶ 7.) This, again, is a legal statement

as a historic building or structure. *See* https://www.nps.gov/subjects/nationalregister/database-research.htm.[5] The Property is not alleged to have been separately designated as historic.

Likewise, insofar as the Metropolitan Nashville Historic Zoning Commission is deemed a local designating agency for purposes of the Exclusion, "historic districts" are defined by the Metro Nashville Code as "geographical areas which possess a significant concentration, linkage, or continuity of sites, buildings, structures or objects which are united by past events or aesthetically by plan or physical development," and the area meets at least one of five listed criteria, including:

> 1. The district is associated with an event that has made a significant contribution to local, state or national history; or
>
> 2. It includes structures associated with the lives of persons significant in local, state or national history; or
>
> 3. It contains structures or groups of structures that embody the distinctive characteristics of a type, period or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
>
> 4. It has yielded or may be likely to yield archaeological information important in history or prehistory; or
>
> 5. It is listed or is eligible for listing in the National Register of Historic Places.

Metropolitan Nashville Code § 17.36.120(A)(5).[6] In other words, for purposes of "local" designation, the inclusion of a building or structure within a Metro Nashville historic district

---

rather than a factual one, and Aspen does not actually allege that the Property has been individually reviewed and certified as having historical significance.

[5] As an example of such a dual listing, the Quarters points out that Fisk University's campus in Nashville is designated as a historic "district" while Jubilee Hall, which is on Fisk's campus and within the historic district, is separately designated as a historic "building." (*See* Doc. No. 24, at 12 (citing National Register Database and Research, https://www.nps.gov/subjects/nationalregister/database-research.htm).

[6] Available at https://library.municode.com/tn/metro_government_of_nashville_and_davidson_county/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.36OVDI_ARTIIIHIOVDI_17.36.120HIDIDE.

covered by a preservation overlay does not automatically mean that the individual building has been designated as a historical structure.

In short, the mere fact that the Property is within a *district* or *area* that has been designated by a federal agency and a local agency as "historic" does not mean that the individual Property has been formally "designated" by either agency as a historic structure or landmark, for purposes of the Exclusion. This interpretation is bolstered by the fact that the Exclusion pertains to any building designated as "*an* historic structure." (Policy, Doc. No. 1-1, at 92–93.) On its face, with the use of the singular article, the Exclusion applies to individually designated historic structures, rather than to groups of buildings within a historic district.

Further, one of the standard "maxims" of contract interpretation employed by the Tennessee courts is *expressio unius est exclusio alterius*, meaning that, "where a contract by its express terms includes one or more things of a class[,] it simultaneously implies the exclusion of the balance of that class." *S.M.R. Enters., Inc. v. S. Haircutters, Inc.*, 662 S.W.2d 944, 949 (Tenn. Ct. App. 1983) (citing 17A C.J.S. Contracts § 312). Applying this maxim here, since the Policy expressly references historic structures and landmarks, but does not mention historic districts or areas, "the logical implication" is that the latter types of properties do not fall within the Exclusion. *See id.*

While neither party points to any caselaw from any jurisdiction addressing the same question presented here, the Quarters has identified a case from South Dakota holding that the phrase "any historic property" in a statute did not include "historic districts." *In re B.Y. Dev. Inc.*, 785 N.W.2d 296, 299–300 (S.D. 2010). The statute at issue there stated that "[a]ny county or municipality may enact an ordinance requiring a county or municipal historic preservation commission to review any undertaking . . . which will encroach upon, damage, or destroy *any*

*historic property included in the national register of historic places or the state register of historic places.*" *Id.* at 299 (emphasis in original). The case arose because a developer applied to the relevant historic preservation commission to expand its resort into land within the Deadwood National Historic Landmark District. The relevant zoning commission denied the application, finding that the proposed project would "encroach upon, damage, or destroy historic properties in the National Register of Historic Places." *Id.* at 298. One of the issues on appeal was whether the phrase "any historic property included in the national register of historic places" included buildings that were within "historic districts," such that the historic preservation commission had the authority to block the proposed project. The South Dakota Supreme Court held that it did not:

> From a plain reading of the statute, the phrase "any historic property" does not include historic districts. The Legislature used the word "property" and by that use we deduce that the Legislature intended to include only those specific properties in the national or state registries of historic places. We discern a difference between historic properties and historic districts, which are made up of buildings, structures, sites, or surroundings that are of historical, architectural, archaeological, paleontological, and cultural significance. *To construe "any historic property" to encompass historic districts as the City insists would force into the statute a word that is simply not there.*

*Id.* at 300 (emphasis added).

The court finds this analysis relevant and persuasive here. Aspen could have, but did not, include language in the Policy excluding from coverage any property *within* a designated historical district. To conclude that the Exclusion applies to a "contributing property" within a historic district would be, to paraphrase the South Dakota Supreme Court, to read into the Policy Exclusion an entire phrase—and an entire class of properties—that simply are not there.

Aspen's arguments in opposition to this conclusion are not persuasive. First, Aspen asserts that, at a minimum, "the pleadings show the GRC endorsement does not apply to the Insured Property" and that it has adequately alleged that the GRC Endorsement is unambiguous and clearly inapplicable to the Property. (Doc. No. 25, at 7, 8.) The court finds, however, that the interpretation

of the Policy and the determination of whether it is ambiguous are legal questions. Aspen's allegations, insofar as they concern the interpretation of the Policy, are not matters the court must accept as true for purposes of ruling on a Rule 12(c) motion. *See Moderwell v. Cuyahoga Cty.*, 997 F.3d 653, 659 (6th Cir. 2021) (reiterating that, in ruling on a motion for judgment on the pleadings, the court "need not accept as true legal conclusions").

Aspen also takes issue with the Quarters' reference to, and reliance on, the NRHP classifications, asserting that the Policy language "does not require that a historical determination comply with the NRHP classifications" and that "application of the NRHP standards ignores that local or state governments have their own designations of historic structures or landmarks which can differ from the NRHP." (Doc. No. 25, at 9.) True enough, but Aspen does not explain how the Property's inclusion within Metro Nashville's Second Avenue Historic Preservation Zoning Overlay qualifies it as having been individually designated as historical. It asserts in a wholly conclusory fashion only that "the designation of the property as contributing to the Second Avenue Commercial District alone excludes the Insured Property from GRC coverage." (Doc. No. 25, at 10.) As set forth above, however, the fact that the Metropolitan Nashville Historic Zoning Commission designated a particular area as historic for purposes of implementing a zoning overlay does not necessarily mean that any individual building within that zone has been designated as a historic structure. Simply being included within a historic preservation zoning overlay or identified as a "contributing" property within the overlay district is not equivalent to having been individually designated as historic.

Aspen also argues that it is simply beyond dispute that the Property is "historic," since it is more than fifty years old and has been "recognized by both federal and local government as having special value or significance." (Doc. No. 25, at 10.) But merely being old does not make something

"historic," and even an arguably historic building will not fall within the Exclusion unless it has been formally designated as such by a government agency.

Aspen also asserts that the Quarters has never produced proof that it has actually spent funds in excess of the insurance proceeds it already received. The Quarters, however, has not sought judgment on the issue of damages. Moreover, it is not clear that the Quarters would have any obligation to provide to Aspen information regarding its expenditures so long as Aspen continues to deny liability for coverage of any of those expenditures above the Policy limits.

Finally, Aspen asserts that it is "pertinent" that the Chancery Court for Davidson County, Tennessee declined to grant summary judgment on this identical issue in a lawsuit initially filed in that court, based on that court's finding that there was a "genuine factual dispute regarding whether the [Property] was designated as historic at the time of loss by 'any local, state or national governmental agency as a historic structure or landmark.'" (*See* Doc. 1-2, at 12.)[7] The Chancery Court's ruling never became final, however, and no party argues that it has preclusive effect in this court. Irrespective of the procedural posture of the case before that court, it is now undisputed by all parties that the Property was identified as a "contributing property" within an NRHP-listed historic district and as a "contributing property" within the Second Avenue Historic Preservation Zoning Overlay. This court finds, as a matter of law, that simply having been identified as a "contributing property" within a historic district is not equivalent to having been formally "designated" by a national or local governmental agency as a "historic structure or landmark," for purposes of the Exclusion at issue here.

---

[7] This opinion was attached to Aspen's Complaint in this court, and its existence may be considered by the court in ruling on the Motion for Judgment on the Pleadings.

Furthermore, even if the court were to conclude that the language at issue was ambiguous, any such ambiguity would, under controlling law, be construed in favor of the Quarters and against Aspen, which would lead to the same result. *See Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) ("[I]f the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls."); *Johnson & Assocs., LLC v. Hanover Ins. Grp., Inc.*, 572 S.W.3d 636, 644 (Tenn. Ct. App. 2018) ("It is well settled that exceptions, exclusions and limitations in insurance policies must be construed against the insurance company and in favor of the insured." (citations omitted)).

In sum, the court finds as a matter of law that the Exclusion contained in the Policy's GRC endorsement does not apply, and the Quarters is entitled to a declaration to that effect.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant the Quarters' Motion for Judgment on the Pleadings (Doc. No. 23), construed as a motion for partial judgment on the pleadings, and will issue a declaration that the Policy's GRC Endorsement covers the Quarters' claim and that the Exclusion contained within the Policy's GRC endorsement does not apply to the Property.

An appropriate Order is filed herewith.

```
                                    _____
                                    ALETA A. TRAUGER
                                    United States District Judge
```